May it please the Court, Counsel. This case is, my name is Elizabeth Best, by the way, I'm from Great Falls, Montana, and I represent Jewel Sternad. This case is about summary judgment which was granted when there were significant and material fact issues made available and shown to the District Court, so summary judgment simply shouldn't have been granted. The Court made the statement in its order that it found not a single genuine issue of material fact and then went on to say that what the plaintiff was contending was that the employer should not have the right to determine quotas for its salespeople. In fact, that was never a demonstrate the arbitrariness of the changes in quotas directly after the plaintiff returned from a three-month disability leave. Counsel, let me ask you this. It appears to be undisputed that your client did not meet the numerical goals that were set, that his productivity was about 75% for a three-month period and so forth. What specific evidence is there that those reasons were pretextual, that is, that there was really something else going on? Even if the standards are unreasonable, they were written standards that apparently were just applicable across the board. Well, Your Honor, first of all, it is disputed that Mr. Sternad was indeed meeting the standards of his employer. For example, and I think this is central to this case, the West's policy requires that a salesperson can be put on a performance improvement plan where his cumulative year-to-date average falls below 85%. One of our central contentions was that the supervisor for this particular salesman, and in fact, Jewel Sternad was treated differently than other salesmen. Before you go past that, as I understood the record, at the end of the year 2002, December 2002, his year-to-date figure was 75% of his 2002 quota. Is that a disputed fact? Yes, it is, Judge. And I would refer you, in fact, as an example only to the Supplement 33, where you can see the percent to year-to-date growth quota as of the time he was fired at 91.90%. Is that December 2002? Oh, I apologize, Judge. I'm asking about December 2002 when all of this started. He had three months, 56%, 44%, and 44%, and a year-to-date of 75% at the end of 2002, as I understand it. Is that a disputed fact? No, that is not a disputed fact. That was for those three months that the court just recited, or for the time period when he was not present because he was out on disability leave. He returned at the first of the year, January, and by January 6th of 2003, his employer had put him on a performance improvement plan. He's his new supervisor. So the point, from our perspective, Your Honor, is that by arbitrarily immediately putting him on a performance improvement plan for a time period which related to his being gone, he was gone on disability leave, is arbitrary. When was he gone? He was gone during the last three months of 2002, for the three months that the court just recited the low figures. So he was put on a performance improvement plan January 6th of 2003. By March, he was 125%, I believe, of quota. He was removed from the performance improvement plan because he had exceeded his company's by April. And he continued to excel after that, although we can see that there were a couple of lower months during the summer. Okay. I'm not sure what you think of as summer, but again, I want your view as to whether these numbers are disputed or not. That in April 2003, his sales were at 71% as of June 10th, 2003. Again, Judge, I don't dispute the first two numbers, the 53.7% and the 22.5% for April and May. However, as of June, he was at 124% of growth quota, and this is on the defendant's Supplement 13 in their appendix to the record. There are numbers which are... Is that true? That's the monthly figure, the 124% is for the month of June, right? Yes. Year-to-date. Year-to-date. That is, yes, this is the sales rep YTD year-to-date summary report, and it's Supplement 13. That can't be. The figure before that is 22% for May and 59% for July. However, you're... So it couldn't be that 124% for June is the yearly figure. Well, I haven't done the math, Judge, and I'm relying on what the employer is saying, and the year-to-date figures were, but in March, it was 122.8. In February, it was 106.6. And April, it was 53. Correct. And May, it was 22% for the year. But all the months up to May, he only did 22%. I thought those were the monthly figures. I understand what you're saying, Your Honor. Well, Counsel, I guess the underlying question is back to where I started, which is, given that at least many of these numbers are not disputed, including some very, very bad months compared to the quota that had been established, what specific evidence is there that these reasons for his termination, that is, poor performance against the quotas, wasn't actually what they had in mind? Well, there are a number of things, Your Honor. One is that this is a, as we pointed out, this is a high-performing salesperson whose downward spiral, if you will, started with a new supervisor who came in and began imposing discipline immediately after Mr. Cernat had done three months of disability leave and was unable to perform at all. Was he disciplined? Is there something in the record, an affidavit, a declaration that shows that they were counting months when he was off on disability? I don't have any such documents, Judge. In fact, one of the problems we have is that this standard he was being judged by was what was being called a three-month rolling average, which appeared nowhere in the personnel policies. It was a new way of determining whether he was meeting a quota. I'm not sure it was in the personnel policy. It is in the policy as we see it on the record. The document. Wasn't your argument only that he didn't know about it? No, Your Honor. The three-month rolling average was something that we actually asked about in discovery and were told that they had no documents to describe the three-month rolling average, nor did they have a way of showing us how it was calculated. It says it's in the West Employment Policy, Phases 1 to 6, the 2001 policy, and it says, in addition, failure to achieve sales results above— no, sorry, a sales professional may also be placed on a formal FIF after any period of three consecutive months in which sales results average below 85 percent quota attainment. It seems to me your problem is you have a disagreement as to what that means. Do you think it means it has to be the three-month— each single month has to be below 85 percent and the company's saying the three-month average? Well, in practice, Your Honor, that is how it had been done, and we submitted affidavits from other salespeople showing that that is how their sales figures had always been calculated. If you go below 85 percent for month one, if you go below 85 percent for month two, and if you go below 85 percent for month three, then you fall within that policy provision. But this rolling average for which they could not show us how it was calculated was something completely new. Well, it's easy to see how it's calculated. You take the three months and the average is less than 85 percent, then you haven't met the standard. There's nothing very hard about how you calculate a three-month average. Well, this was a new way of calculating it for these salesmen, Your Honor. This was completely different for the plaintiffs as well. That's a different point. If you're saying that they always applied it by requiring that there be three months, each of which is below 85 percent, and that had been a uniform application except in the case of your client, that's a different argument than saying that there's only one possible interpretation of that line. You're saying both, I think. Well, Your Honor, I'm saying that when asked, other employees said that this was not how it was ever done. This is the three-month rolling average when the defendant was asked, said they have no way of telling us where it came from or how it was calculated. I understand what you're saying, Your Honor, that your interpretation is that it's easy to calculate. The defendant was unable to tell us how it was calculated when we asked. All right. Do you want to save your one minute? Oh, you're over. All right. Thank you. We'll give you a minute anyway. Good morning, Your Honors. It pleases the Court, James Rittinger, Sally Stevens-Birkenberg for West Publishing. Let me start with what happened in January of 2003. Let me ask you one question first. Is there anything in the record that shows that the policy in the past was applied by requiring that there be three months, each of which was below 85 percent? What there is in the record is West's policy that states that unequivocally. I know what the written policy says. I'm talking about the practice. Are there affidavits in the record that describe, by either side, how that policy has been applied in the past? Well, I would say the answer to that is there's nothing in the record that shows that the three-month rolling average was applied to other people, nor was there any necessity for it to do so. By either side? I would say by either side, Your Honor. There are no affidavits then? Right. But let's look where we were at the end of 2003. We have a part of it. At the end of 2003 or the end of 2002? I'm sorry. We're talking about the beginning of 2003. Thank you, Judge. Where we were is we were looking at, going back, what had he done at that point in time. He had only met 75 percent of his year quota, number one, which, under the written policy, would permit us to put him on a PIP, the Performance Improvement Plan. Was there anything in the record that showed that he was off on disability during a period? Yes. Your Honor, that's very interesting. I can't find it right now in the appellant's brief. But you will see in the appellant's brief that at one point she talks about him being out for six weeks, and another time she talks about him being out for three months, in the brief. All right? There's nothing from either the plaintiff or in the plaintiff's brief that talks about what time period that is. But what is in the record? What is in the record is, first of all, from the plaintiff himself, where he says that during the year I was out on disability leave for six weeks. That's the extent of what he says on the record about when he was out during 2002. And what our affidavits say, and remember, this is summary judgment where you have to raise a legitimate issue of fact. You just can't say it's not so. You have to do something about it. In our affidavit, we say in 2002, Mr. Stenward was on disability leave from August 15th until September 9th, a period of approximately three weeks. So that's what's in the record about his time. It has been blown way out of proportion, not at the trial level, Your Honors, but in the appellate briefs submitted to the Ninth Circuit. So there's nothing in the record that shows that he was absent on disability during those last three months in 2002 when the performance was as low as it was. That's correct, Your Honor. And more to the point with that, well, not more to the point. I think that is to the point. But it's 75 percent year-to-date. It's under 85 percent if you average it, which is what the second or the first part of the policy, the average cumulative. Judge Reiner, I think you struck it. I mean, we don't have something that says you take the three months and divide them by three. That seems to be what Plaintiff's whole complaint here is. But even if you take the cumulative point away, he still didn't make it on a year-to-date basis. And, moreover, her interpretation is that it has to be three consecutive months. Judge Graber, it was three consecutive months. Well, well under 85 percent. So no matter how you look at it and how you apply the standard, I think it's — Three consecutive months. That would be October, November, and December. Of 2002. Of 2002. So, Your Honor, there are no legitimate issues. In fact, if you read Plaintiff's brief, it makes the reference to false, arbitrary, capricious, whimsical about 45 times in both briefs. But by saying it doesn't make it so. We had a district court judge, and I'm well aware that at least two members of this panel have had previous dealings with the Montana Wrongful Discharge and Employment Act. But on a summary judgment motion, the district court could not have been more aware of what his duties were in terms of looking at the record and finding a legitimate disputed issue. In fact, his own words were to say that it's difficult to get summary judgment under that act is an understatement. But if this case isn't the case, I don't know what case would be. Let's look what happened. We get to the point at the end of 2002 where he's cumulative, his average, and his three consecutive months, and no legitimate dispute about that. The only thing that we've seen on this appeal, which wasn't raised below, is that he was out for three months during that period of time, but there's nothing in the record to show that. In fact, it's contradicted by the Plaintiff's attorney's client's affidavit in opposition to summary judgment, because he says it's only six months, and he doesn't put it. Six weeks or six months? I'm sorry, six weeks. I apologize. Six weeks.  We do give a point in time. We say it's three weeks, and we say it's before those three months. I mean, that can't raise a legitimate issue of fact. If the other point of the Plaintiff's argument, in her reply brief, and as she stood up before Your Honors today, she said, we're not complaining about the quotas. Well, if you read the reply – if you read the moving brief and the reply brief, it seems to me that that's all they complain about. And, again, judge – the district court looked at that and said there's nothing in the record to show that West was doing it for any other reason but a legitimate reason. And if West can't – if all you have to do is say my quota is unreasonable and not defeat summary judgment, then managers, businesses like West are no longer managing their sales force. It's Montana juries that are doing it. And as the district court said, that simply cannot be the law. It's got to require more. Montana may make it difficult for summary judgment, but it doesn't make it impossible. And then, I think, Your Honors, if you look at the PIP and what happened with the PIP, he did have a couple of months where he improved, and we immediately took him off the PIP. Now we're talking about a performance improvement plan that was given to him in writing where he was asked to do certain things. All right? And his – his sales improvement – his – his sales did improve, but then, Judge Graber, as someone pointed out, I forget which one – which one of Your Honors. Again, his sales fell off the chart, 42 percent, 22 percent for two months in a row. He was placed back on the PIP. Now, there were three things that he had to do on the PIP. He had to keep – now we're talking about cumulative averages. No doubt about that. The PIP could not be more clear about that. It's well below. All right? And we're talking about tending back the basics for us. Of course, the manager doesn't have the right to tell a salesman who's underperforming that you have to go to a back-to-basics course. We're going to try to help you. We're going to try to train you. Again, who can take that away? And you have to submit weekly sales reports. Your Honors, the record could not be more clear as to how he reacted to that. Who knows if he'd be here today if he had done his back-to-basics and he had done his weekly reports and his sales still fell under. Maybe we wouldn't be here. But not only did he not do them, but he called them a waste of time and told his manager that he didn't know anything about sales. How can you run a company? How can you run anything if you are not committed to have a standard when your salesman doesn't meet the standard, give him a written warning, and when he performs under the written warning, you take him off, but when he falls under it, you put him back on, and instead of performing, he falls well below those standards and then really basically tells you, go to heck. I'm not going to do it. That's really what the record here is, and there's no legitimate fact that can test that record in any legitimate fact whatsoever. Finally, I guess I would say, if we're looking for a pretext, they certainly didn't come up with it because all they said in their brief is, for whatever reason, Wes did this. What possible reason would Wes have if he wants to sell books? That's what it's in business for. If a salesman sells books, it hires him, and it pays him a commission. If it doesn't, they've got to get somebody else to do it. That's the nature of the beast here. So, unless there's any questions, thank you very much for your attention. Thank you. We'll give you one more minute if you'd like. I think that it's important for the court to understand that there is an arbitrary application of policy, and I referred the court to Appellant's Excerpt of Record, page 65, which shows that as of June, he was at 96.2% of his percent quota attained. Again, this is one of the defendant's own documents. We have presented affidavits, which are attached to the Excerpt of Record from Stuart Snipper and from Douglas Boyd, as well as from Jewel Sternad, pointing out that they had always been judged, always, by the year-to-date standard, which is articulated in the policy. The decision not to apply it this time is arbitrary. There is no requirement, by the way, in Montana law under the Discharge Act to show pretext, although that has been discussed. The question of what a legitimate business reason is, whether it's false, arbitrary, whimsical, or capricious. What I tried to show in our briefs are that the standards that were applied to Jewel Sternad were indeed arbitrary. And I should also point out that when he was placed on the performance improvement plan arbitrarily in January, he was removed from it by, I believe, either March or May by the defendant because he was exceeding their own standards. So any reference back to the period of 2002 as a basis for firing him is simply, on the defendant's own terms, not a basis. I thank you all for your time. Thank you, counsel. Case case argument will be submitted. The next case for oral argument is Madam Ethelfield v. Hoffman.
judges: Reinhardt, Graber, Lew